Argued June 23, reversed October 16, 1978

In the Matter of Phyllis Phyll, Alleged to be a
Mentally Ill Person.
STATE OF OREGON, *Respondent,*
*v.*
PHYLLIS PHYLL, *Appellant.*
(No. 44855, CA 10336)
585 P2d 48

Robert D. Scholz, Portland, argued the cause and filed the brief for appellant.

Catherine Allen, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Johnson, Gillette and Roberts, Judges.

ROBERTS, J.

**ROBERTS, J.**

Appellant appeals an order of the circuit court finding her to be a mentally ill person and committing her to the State Mental Health Division. We review de novo on the record to determine whether beyond a reasonable doubt appellant is unable to provide for her basic personal needs and is not receiving such care as is necessary for her health and safety pursuant to ORS 426.005(2).[1] We conclude that the evidence is not sufficient to meet the beyond a reasonable doubt test.

The standard for determining whether a person is able to provide for basic needs was set forth by this court in *State v. Alexander,* 26 Or App 943, 946, 554 P2d 524 (1976): "The ability of one to care for himself requires a finding of existing conditions." A finding that a person is unable to provide for basic needs must be accompanied by a determination that the inability is due to a mental disorder.

A Portland police officer discovered appellant, a 50-year-old woman, sleeping in a bus shelter where she had apparently spent two nights. She had all of her personal possessions either pinned to her clothing or in plastic buckets. Her pants were urine stained and she explained that the nearby filling station restroom was closed at night. The officer described her as unkempt and in need of a bath. She was evasive and disorganized in answering questions put to her by the police officer and by the examiners at her subsequent hearing. She stated that she had moved out of her former residence because the heating systems bothered her lungs and the bathing facilities were unsatisfactory. She indicated that she was behind in her rent. Her

---

[1] ORS 426.005(2) provides:

"(2) 'Mentally ill person' means a person who, because of a mental disorder, is either:

"(a) Dangerous to himself or others; or

"(b) Unable to provide for his basic personal needs and is not receiving such care as is necessary for his health or safety."

The question whether appellant is dangerous to herself or others has not been raised on this appeal.

[ 629 ]

only means of support was apparently an unspecified amount of public assistance and at the time of her encounter with the police officer she had only twenty-two cents.

The record reflects that appellant was capable of making reasonable decisions concerning her nutrition. She had a bag of partially eaten hamburger buns with her. She ate baby food (meat and vegetables), which she found to be cheap and adequate for a sedentary person like herself, and she appreciated the value of high carbohydrate foods for energy.

Appellant testified that she got between 7-10 hours of sleep a night, and she added that it would be perfectly normal to sleep an entire 24-hour day. Her health was good except for a cold. Her dress was limited by her poverty, but nevertheless adequate for the weather. The major deficiency in providing for her own basic needs was housing. It seems clear that appellant had run out of money and had no place to go. She at least chose a covered bus shelter to sleep in.

The question is whether or not appellant's decisions about the expenditure of her finances and subsequent selection of a bus stop for shelter were such that it can be stated beyond a reasonable doubt that she is unable because of a mental disorder to make decisions about her basic needs. We conclude that these decisions are as likely a result of appellant's financial position as of her mental condition.

While the examining health professionals both agreed that appellant suffered from a mental disability, they disagreed on whether or not the disability resulted in an inability to provide for her basic needs. In response to questioning by the court, one of the examiners stated:

"I think in terms of living problems, what would be most helpful would be the social service she would get in the hospital. The psychiatric or psychological, I don't see that as being anything that will offer a great deal of benefit, that that is going to change. It seems like she

gets along reasonably well * * * I don't think that would be significantly improved by hospitalization, and I don't think at this point in time she is grossly unable to provide for her basic needs."

The other examiner believed that sleeping in bus shelters in the month of January was dangerous and life threatening. Appellant's behavior led this examiner to conclude that she had an impaired ability to realize danger and, therefore, involuntary commitment and subsequent referral to social services was recommended.

In light of the fact that the record shows both doctors were hesitant to draw conclusions because of the lack of information regarding appellant's history, we conclude that the burden of proving appellant a mentally ill person beyond a reasonable doubt has not been met. The record shows appellant's understanding of bus routes, her ability to solve simple problems, her understanding of where to pick up her social security check, and her grasp of her options as to possible places to live. Appellant is a person with severe financial problems and the concern of the trial court for her well-being is understandable. However, appellant's financial straits do not place her within the meaning of the involuntary commitment statute.

Reversed.